**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
GARUD SUDARSAN, individually and on behalf :
of all others similarly situated,

                      Plaintiff,

          -against-

SEVENTY SEVEN ENERGY INC.,
PATTERSON-UTI ENERGY, INC. and
PYRAMID MERGER SUB, INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM DECISION AND**
**ORDER**

17 Civ. 2342 (GBD) (GWG)

GEORGE B. DANIELS, United States District Judge:

Third-party Plaintiff Garud Sudarsan brought this action against Defendants Seventy Seven Energy Inc. ("SSE"), Patterson-UTI Energy, Inc. ("PUTI"), and Pyramid Merger Sub, Inc. ("Pyramid") (collectively, "Defendants"), alleging breach and tortious interference with a contract to which he is not a party. (Compl., ECF No. 1.) Defendants moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. to Dismiss, ECF No. 10.) Without seeking leave to amend, Plaintiff then filed an Amended Complaint. (Am. Compl. ("AC"), ECF No. 27.) Defendants moved to strike, or in the alternative, to dismiss Plaintiff's Amended Complaint. (Mot. to Strike, ECF No. 28.)

Defendants' motions to dismiss the Complaint and to strike the Amended Complaint are GRANTED.

## I.      BACKGROUND AND PROCEDURAL HISTORY

SSE is an oilfield services company that offers a variety of "wellsite services and equipment to land-based exploration and production customers in the United States." (Compl. ¶ 24.) PUTI and its subsidiaries, including Pyramid, is also an oilfield services company that

operates "land-based drilling rigs in oil and natural gas producing regions of the continental United States and western Canada." (*Id.* ¶ 25.)

In 2016, SSE ran into financial trouble and in turn filed for Chapter 11 bankruptcy. (*Id.* ¶ 17.) As part of the reorganization, SSE deleveraged its balance sheet by converting approximately $1.1 billion of bond debt into "new" common equity. (*Id.*) In addition, SSE issued Series, A, B, and C warrants to holders of the "old" common shares. (*Id.* ¶¶ 17–18.) Plaintiff is a holder of SSE's Series B and C warrants. (*Id.* ¶ 12.)

**A.    Warrant Agreement**

The warrants are governed by the Warrant Agreement, dated August 1, 2016.  Per the Warrant Agreement, Series A and B warrants expire on "the earlier of (i) Close of Business on August 1, 2021 and (ii) the date of completion of A) any Affiliated Asset Sale or (B) a Change of Control." (Decl. of Marisa Antos-Fallon ("Fallon Decl."), Ex. 1 ("Warrant Agreement"), ECF No. 12-1, § 1.01.)[1]  The Series C warrants expire on "the earlier of (i) Close of Business on August 1, 2023 and (ii) the date of completion of (A) any Affiliated Asset Sale or (B) a Change of Control." (*Id.*)

A "Change of Control" is defined by the Warrant Agreement to include, *inter alia*, a "Non-Affiliate Combination." (*Id.*)  A "Non-Affiliate Combination" is defined as:

> [A] [consolidation or merger ("Fundamental Equity Change")] where (i) the acquirer is not an Affiliate of [SSE] or any of its or its Affiliates' officers, directors, employees, or members and (ii) all of the equity held by equity holders of [SSE] . . . outstanding immediately prior thereto is extinguished or replaced by equity in a different Person (other than a Fundamental Equity Change in which the equity interests in [SSE] outstanding immediately prior thereto are replaced in a merger or other

---

[1] This Court takes judicial notice of the Warrant Agreement because it is incorporated into Plaintiff's Complaint by reference. (*See* Compl. ¶¶ 23, 33, 35); *see infra* note 5.

corporate combination with equity in the surviving Person representing more than 50% of the total equity in such surviving Person).

(*Id.*)

In the event of a Fundamental Equity Change, Sections 5.06 and 5.07 of the Warrant Agreement require certain steps to be taken with respect to the issuance, exercise, and adjustment of the warrants. (*Id.* §§ 5.06, 5.07.) Most pertinently, Section 5.07(a) provides that, to the extent that there remain any warrants outstanding and unexpired following the effective time of, *inter alia*, a Fundamental Equity change or reorganization event, the right of warrant holders to receive SSE common stock shall be converted into the right to receive the same kind and amount of assets (whether they be stocks, other types of securities, etc.) that SSE stockholders received in connection with the Fundamental Equity change or reorganization event. (*Id.* § 5.07(a)).

However, with the exception of one subsection, Sections 5.06 and 5.07 explicitly exclude (and do not apply to) Non-Affiliate Combinations. (*Id.* §§ 5.06, 5.07.) Section 5.06 begins by stating, *"[o]ther than with respect to a Non-Affiliate Combination . . . ."* (*Id.* § 5.06 (emphases added).) Similarly, Section 5.07 begins by stating, "[i]f there occurs any Fundamental Equity Change *other than a Non-Affiliate Combination . . . ."* (*Id.* § 5.07 (emphases added).)

The one subsection that does apply to Non-Affiliate Combinations, Section 5.06(d), provides specifically for the early termination of warrants in the event of a stock-for-stock, Non-Affiliate Combination. Section 5.06(d) states:

> [I]n any Non-Affiliate Combination [in which holders of Common Stock are paid consideration for their shares in a form other than cash], holders of the Warrants . . . shall have until ten (10) Business Days prior to the consummation of such Non-Affiliate Combination to exercise their respective Warrants in accordance with Section 4.02, and any Warrants not exercised pursuant to this provision shall terminate (without any readjustment to the Exercise Prices and/or the Number of Warrants).

(*Id.* § 5.06(d).)

The Warrant Agreement also contains a clause, which negates enforcement of the agreement by third parties (the "Negation Clause"). Section 7.17 of the Warrant Agreement states:

Nothing in this Warrant Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person or corporation other than the parties hereto and the Registered Holders any right, remedy, or claim under or by reason of this Warrant Agreement or of any covenant, condition, stipulation, promise or agreement hereof, and all covenants, conditions, stipulations, promises and agreements in this Warrant Agreement contained shall be for the sole and exclusive benefit of the parties hereto and their successors and of the Registered Holders.

(*Id.* § 7.17.)

## B.   Merger

On December 12, 2016, SSE and PUTI announced that the two entities were merging. (Compl. ¶ 26.)   Pursuant to the Agreement and Plan of Merger, dated December 12, 2016 (the "Merger Agreement"), PUTI agreed to acquire all of the outstanding shares of SSE in a stock-for-stock exchange, with SSE merging into and with Pyramid, and SSE surviving the Merger as a wholly-owned subsidiary of PUTI (the "Merger"). (*Id.* ¶¶ 26, 30; Fallon Decl., Ex. 2 ("Merger Agreement"), ECF No., 12-2, §§ 1.1, 2.2.)[2]   The Merger Agreement also contained an acceleration clause (the "Acceleration Clause"), which provided that SSE warrants would be treated in accordance with the terms of the Warrant Agreement, and that any SSE warrant not exercised immediately prior to the time that the Merger closes and becomes effective[3] (the "Effective Time") would "expire unexercised" and terminate. (Compl. ¶ 39; Warrant Agreement § 2.3(a).)

The Merger closed on April 20, 2017. (Fallon Decl., Ex. 6 ("PUTI Form 8-K"), ECF No. 12-6.) Upon closing, SSE shareholders received approximately 1.7851 shares of PUTI for every share of

---

[2] This Court takes judicial notice of the Merger Agreement because it is incorporated into Plaintiff's Complaint by reference. (*See* Compl. ¶¶ 29, 39); *see infra* note 5.

[3] The Merger Agreement states that: "The Merger shall become effective upon the later of: (a) the date and time of the filing of the Certificate of Merger with the Secretary of State, or (b) such later date and time as may be specified in the Certificate of Merger as agreed to by the Parties." (Merger Agreement § 1.3.)

SSE, which ultimately represented approximately 25% of PUTI shares then outstanding. (Fallon Decl., Ex. 5 ("Joint Proxy Statement"), ECF No. 12-5; *see* Compl. ¶ 30.)[4]

## C.    Plaintiff's Suit

Plaintiff, an alleged warrant holder of SSE, filed the instant action on March 31, 2017, alleging that Defendants breached and tortiously interfered with Sections 5.06 and 5.07 of the Warrant Agreement by prematurely cancelling his warrants upon the conclusion of the Merger, through the Acceleration Clause, rather than adjusting his warrants, as required by the Warrant Agreement. (*See* Compl. ¶34.)    On April 28, 2017, Defendants moved to dismiss Plaintiff's Complaint.    Without seeking leave to amend, Plaintiff then filed an Amended Complaint on September 21, 2017, which Defendants moved to strike, and in the alternative, to dismiss.

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires pleading facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.    Thus, the factual allegations pled "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.[5]

---

[4] This Court takes judicial notice of the Joint Proxy Statement and PUTI Form 8-K because they are public filings with the Securities Exchange Commission. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (citation and quotation marks omitted).

[5] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 CIV. 6909, 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court also draws all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

### III.    PLAINTIFF'S CLAIMS ARE DISMISSED

Plaintiff's claims cannot withstand a motion to dismiss because Plaintiff lacks standing, and Plaintiff has failed to sufficiently allege a breach of the Warrant Agreement.

### A.    Plaintiff Lacks Standing

Plaintiff does not have standing in the instant action because Plaintiff is a third-party who lacks enforceability rights under the Warrant Agreement. Pursuant to New York law, "where a provision in a contract expressly negates enforcement by third parties, that provision is controlling." *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 859 F.2d 242, 249 (2d Cir. 1988). Where a contract contains a negating clause but also mentions third parties, courts "look to the specific text of the negating clause to determine the parties' intent." *Dean St. Capital Advisors, LLC v. Otoka Energy Corp.*, No. 15-cv-824 (RJS), 2016 WL 413124, at *5 (S.D.N.Y. Feb. 1, 2016); *see also Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) ("To create a third party

---

bringing suit.'" *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

right to enforce a contract, the language of the contract must clearly evidence an intent to permit enforcement by the third party.") (brackets, quotation marks, and citation omitted).

Here, the Negation Clause clearly prohibits third parties like Plaintiff from having enforceability rights under the Warrant Agreement. As indicated above, the Negation Clause states that "[n]othing in this Warrant Agreement . . . is intended, or shall be construed, to confer upon, or give to, *any Person or corporation other than the parties hereto and the Registered Holders* any right, remedy, or claim under or by reason of this Warrant Agreement . . . ." (Warrant Agreement § 7.17 (emphases added).) Plaintiff is not a "party hereto" nor has he alleged that he is a Registered Holder. While the term "party" is not defined anywhere in the Warrant Agreement, the phrase, "parties hereto," plainly refers to the signatories to the Warrant Agreement. *See Seabury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d. Cir. 2002) ("Where the contract is unambiguous, courts must effectuate its plain language."). The signature page of the Warrant Agreement states that "this Warrant Agreement has been duly executed by the parties hereto," and proceeds to list the three signatories to the agreement:  SSE, Computershare Inc., and Computershare Trust Company, N.A. (Warrant Agreement at 40–41.) Plaintiff's name is not one of them.

While Plaintiff claims to be a warrant holder, he does not allege that he is a "Registered [warrant] Holder." (*See generally* Compl.) A Registered Holder is explicitly defined in the agreement as a "Person in whose name any Warrant is *registered upon the Warrant Register*." (*Id.* § 2.03(c) (emphases added).) Nowhere in the Complaint does Plaintiff allege that a warrant is registered under his name in the Warrant Register. As a result, Plaintiff is exactly the type of third party whom the

parties intended to exclude from enforcing the Warrant Agreement, and who, in turn, lacks standing to sue Defendants.

Despite the Negation Clause, Plaintiff makes several arguments as to why he nonetheless has standing to sue Defendants, none of which are availing. First, Plaintiff argues that the term "parties" is "not defined in the Warrant Agreement anywhere." (Pl.'s Opp'n to Mot. to Dismiss ("Opp'n"), ECF No. 17, at 6.) While that may be true, the phrase, "parties *hereto*," can be defined, as the phrase plainly refers to the three signatories to the agreement, for the reasons stated earlier. Second, Plaintiff suggests that he has standing to sue, despite the Negation Clause, because the Warrant Agreement confers warrant holders, such as himself, certain benefits and rights. (Opp'n at 6–7.) In support of this proposition, Plaintiff cites mainly to *Diamond Castle Partners IV PRC, L.P. v. IAC/InterActiveCorp.*, 82 A.D. 3d 421 (N.Y. App. Div. 2011). In *Diamond Castle*, defendant moved to dismiss plaintiffs' breach of contract claim for lack of standing because plaintiffs were not signatories to the contract and the contract contained a "No Third-Party Beneficiaries" provision, which limited enforcement of the contract to "parties." *Id.* 421–22. The New York Appellate Division upheld the lower court's denial of defendant's motion on the basis that the term "parties" was undefined and plaintiffs possessed indemnification rights under the contract. *Id.*

However, not only is the meaning of the term "parties" discernible here, but courts have also refused to interpret *Diamond Castle* to mean that third parties automatically have standing to enforce an agreement, even in the presence of a negating clause, merely because the agreement grants them certain benefits or rights, especially when the agreement "does not contain conflicting clauses regarding third-party beneficiaries." *Freidman v. N.Y.C. Taxi & Limousine Comm'n*, 139 A.D. 3d 405, 406 (N.Y. App. Div. 2016); *see, e.g., In re Lehman Bros. Holdings Inc.*, 479 B.R. 268, 276 n.2 (S.D.N.Y. 2012). In fact, adopting Plaintiff's suggested proposition would run directly contrary to established precedent. As indicated earlier, courts are required to apply a test in determining whether

third-party standing exists, not a per se rule: Where a contract contains a negating clause but also mentions third parties, courts are required to examine the specific text of the clause to determine whether the parties intended for third parties to have standing to enforce the agreement. *Dean St. Capital*, 2016 WL 413124, at *5.

In this case, the intent of the parties to the Warrant Agreement is clear. It was specifically to exclude third parties like Plaintiff from having standing to enforce the agreement, despite whatever rights or benefits the agreement may confer on them. The Negation Clause not only excludes third parties (other than signatories and Registered Holders) from having any "right, remedy, or claim under or by reason of th[e] Warrant Agreement," but it also explicitly states that "*[n]othing* in th[e] Warrant Agreement expressed and *nothing* that may be implied from any of the provisions [t]hereof [including any covenant, condition, stipulation, promise or agreement] is intended, or shall be construed, to confer upon, or give to, any [third party]" the right to enforce the terms and conditions of the agreement. (Warrant Agreement § 7.17 (emphases added)); *see India.com, Inc. v. Dalal*, 412 F.3d 315, 321–22 (2d Cir. 2005) (affirming the lower court's dismissal of the suit for lack of third-party standing because the negating clause explicitly prohibited third-party standing on the basis of the mere mentioning of third party rights in the agreement or its schedules). Furthermore, adopting Plaintiff's suggested proposition would run "contrary to the principle in New York law that contracting parties may simultaneously elect to confer a benefit or right upon a third party and to limit that right, including by limiting the third party's enforcement powers." *In re Lehman Bros.*, 479 B.R. at 276 n.2 (citation and quotation

marks omitted).  As such, the mere fact that Plaintiff, as a warrant holder, has certain benefits or rights arising from the Warrant Agreement is insufficient to confer standing upon Plaintiff.

Third, Plaintiff argues that even if this Court were to find that Plaintiff lacks standing, this Court should still refuse to dismiss this case because "Plaintiff is in the process of seeking the Registered Holder's authorization." (Pl.'s Opp'n to Mot. to Strike ("Mot. to Strike Opp'n"), ECF No. 38, at 14.)  Plaintiff is correct in asserting that courts have allowed plaintiffs who lack standing because they are merely beneficial owners or holders of notes, and not registered holders, to acquire standing by receiving authorization to sue from the registered holder(s). *See, e.g., Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 607 (S.D.N.Y. 2015).  However, at the present moment, Plaintiff has yet to obtain such authorization. *See Cortlandt St. Recovery Corp. v. Hellas Telecomms. S.Á.R.L.*, 996 N.Y.S.2d 476, 559 (Sup. Ct. 2014) (dismissing one of the plaintiffs from the suit because the plaintiff had yet to obtain authorization to sue from a registered holder or trustee).  Plaintiff cites to Federal Rule of Civil Procedure 17 for the proposition that courts may not dismiss an action until after a party who lacks standing has been given a "reasonable time" to obtain authorization from a registered holder to acquire standing. (Mot. to Strike Opp'n at 14.)  Yet, it has been nearly eight months since Defendants initially raised the issue of standing in their motion to dismiss, and Plaintiff has yet to obtain the Registered Holders' consent. As a result, this period of time was reasonable in allowing "for the real party in interest to ratify [Plaintiff's participation in the instant action]."  Fed. R. Civ. P. 17; *see, e.g., OSRecovery, Inc. v. One Groupe Intern., Inc.*, No. 02 Civ. 8993 (LAK), 2005 WL 3782432, at *5

(S.D.N.Y. Aug. 1, 2005) (stating that the determination of what constitutes a reasonable time is left to the discretion of the court, and finding a period of more than five months to be reasonable).[6]

Therefore, because Plaintiff's counterarguments do nothing to overcome Plaintiff's lack of standing—based on the plain language of the Negation Clause and Plaintiff's status as a third party—this Court dismisses Plaintiff's Complaint.

**B.    Plaintiff Fails To Sufficiently Allege Breach Of The Warrant Agreement**

Even if Plaintiff had standing, Plaintiff's claims would still be dismissed because the Merger constituted a Non-Affiliate Combination. Plaintiff's claim for breach of contract (and tortious interference) is based on Defendants' alleged violation of Sections 5.06 and 5.07 of the Warrant Agreement. (*See* Compl. ¶¶ 4, 23, 27, 28, 35.) Plaintiff argues that Defendants violated the aforementioned sections by prematurely terminating his warrants through the Acceleration Clause, rather than making the necessary adjustments to his warrants, as required by the Warrant Agreement. (*Id.*)

Yet, Sections 5.06 and 5.07 specifically exclude (and do not apply to) Non-Affiliate Combinations. In fact, the only section that applies to Non-Affiliate Combinations, Section 5.06(d), explicitly provides for the early termination of warrants in transactions such as the one that occurred in this case. It states: "in any Non-Affiliate Combination, holders of [SSE warrants] . . . shall have until ten (10) Business Days prior to the consummation of such Non-Affiliate Combination to exercise their respective Warrants in accordance with Section 4.20, and any Warrants not exercised pursuant to this proviso *shall terminate (without any readjustment to the Exercise Prices and/or Number of Warrants).*" (Warrant Agreement § 5.06(d) (emphases added).)

---

[6] Even if this were not a reasonable amount of time, this Court still dismisses Plaintiff's claims based on Plaintiff's failure to sufficiently allege breach of or tortious interference with the Warrant Agreement. *See infra* Sections III.B, C.

The Acceleration Clause mirrors this language (and, if anything, provides for a *later* termination date) by providing for the termination of SSE warrants not exercised immediately prior to the close of the Merger.

Here, the Merger constituted a Non-Affiliate Combination because PUTI, a non-Affiliate, acquired SSE in a stock-for-stock exchange in which all shares held by SSE's shareholders were extinguished and replaced by shares in PUTI, an entity separate and distinct from SSE. The definition of a Non-Affiliate Combination consists of two elements. It is defined as a Fundamental Equity Change (a consolidation or merger) in which: (i) the acquirer is not an Affiliate of SSE (or any of its or its Affiliates' officers, directors, employees or members) and (ii) all of the equity held by SSE's shareholders outstanding immediately prior to the Fundamental Equity Change is extinguished or replaced by equity in an entity other than SSE. (Warrant Agreement § 1.01.) An "Affiliate" is defined as an entity that is under the "control" of another such that another has the "power to direct the [entity's] management and policies . . . ." (*Id.*)

With regard to the first element, Plaintiff has failed to plead any facts that would allow this Court to draw the reasonable inference that PUTI is an Affiliate of SSE. While PUTI and SSE may provide very similar services in the same industry, nowhere in the Complaint does Plaintiff allege that anyone, let alone SSE, had the power to direct PUTI's management and policies.

Similarly, the Merger plainly meets the second element because the Merger involved a stock-for-stock exchange in which each share of SSE was extinguished and replaced by a share in PUTI (Compl. ¶¶ 26, 30.) To be precise, the Merger was consummated by Pyramid merging into and with SSE in an all stock-for-stock transaction, with SSE continuing as the surviving entity. (Merger Agreement § 1.1.) Pursuant to the Merger Agreement, the Merger proceeded in the following manner: First, all shares of SSE then-owned by SSE or any of its wholly-owned subsidiaries were extinguished (without any consideration). (*Id.* § 2.1(a)(i).) Second, all shares of SSE then-owned by PUTI or

Pyramid were extinguished (without any consideration). (*Id.* § 2.1(a)(ii).) Finally, each share of SSE then remaining was replaced by, or converted into, the right to acquire shares in PUTI.[7] (*Id.* § 2.1(a)(iii).)

Based on this sequence of events, it is clear that the Merger qualified as a Non-Affiliate Combination not only because PUTI, a non-Affiliate, acquired SSE, but also because all shares in SSE were extinguished and replaced by shares in an entity other than SSE, namely PUTI, after the merger. The fact that SSE ended up being the surviving company of the Merger, as Plaintiff alleges and argues, is of no consequence and does not alter this conclusion. (*See* Compl. ¶6; Opp'n at 9.) As a result, contrary to what Plaintiff alleges, Defendants cannot plausibly be said to have violated Sections 5.06 and 5.07 of the Warrant Agreement when these provisions do not apply to the transaction at issue, and the one subsection that does, specifically allows for the early termination of Plaintiff's warrants.[8]

In response, Plaintiff argues that Sections 5.06 and 5.07 do apply because the Merger constituted a reorganization, not a Non-Affiliate Combination. In making this argument, Plaintiff relies on the Recitals of the Merger Agreement, which provide that ". . . it is intended that the Merger qualify as a 'reorganization' . . . ." (Merger Agreement at 1.) However, Plaintiff adopts too broad of a reading of the parties' stipulation in the Recitals. While the Merger Agreement does state that the Merger shall qualify as a reorganization, it goes on to state that the Merger will only

---

[7] The Merger Agreement does state that, after this final step, all shares in Pyramid then outstanding shall be converted into shares of SSE (Merger Agreement § 2.1(iv).) However, this step was necessary to ensure that SSE continued as the surviving entity after the Merger, and does not change the fact that all SSE shares were initially extinguished and replaced by those in PUTI.

[8] The Warrant Agreement does contemplate one exception to the definition of a Non-Affiliate Combination. The agreement provides that a Fundamental Equity Change in which SSE shareholders receive more than 50% of the equity in the post-merger entity will not be considered a Non-Affiliate Combination. (Warrant Agreement § 1.01.) However, the exception does not apply to this case because SSE shareholders only received approximately 25% of the equity in the combined company's outstanding common stock, immediately following the completion of the Merger. (Compl. ¶ 30; *see* Joint Proxy Statement at 37.)

qualify as one for a very specific and limited purpose: "U.S. federal income tax purposes." (*Id.*) This is precisely the reason that the Recitals also state that the Merger shall qualify as a "reorganization" "*within the meaning of Section 358(a) of the Internal Revenue Code of 1986* . . . ." (*Id.* (emphases added).) But, even if the Merger constituted a reorganization (in addition to a Non-Affiliate Combination), Plaintiff fails to adequately allege a breach of Sections 5.06 and 5.07 of the Warrant Agreement. Section 5.06 does not even mention the term reorganization, let alone delineate requirements that pertain to reorganizations. Likewise, while Section 5.07 sets forth certain adjustments that must be made to warrants following a Fundamental Equity Change or a reorganization, it still explicitly excludes Non-Affiliate Combinations from these requirements. (Warrant Agreement § 5.07(a).)

Even if Sections 5.06 and 5.07 did somehow apply to the Merger, Plaintiff's claim would still fail to withstand a motion to dismiss because the Complaint does not plausibly allege how the Acceleration Clause violated these provisions. Aside from Section 5.06(d), which, again, explicitly allows for the early termination of warrants in transactions such as the one at hand, Section 5.06 is silent with regard to when warrants may or may not be terminated. Section 5.06(b) does state that, in the event of a Fundamental Equity Change (other than a Non-Affiliate Combination), the surviving company "may cause to be signed, and may issue any or all of, the Global Warrants issuable pursuant to this Warrant Agreement which therefore shall not have been issued by [SSE]." (Warrant Agreement § 5.06(b).) Yet, this language is not definitive one way or another regarding if and when warrants may be terminated.

On the other hand, Section 5.07 does state that following the effective time of, *inter alia*, a Fundamental Equity Change or a reorganization event (other than a Non-Affiliate Combination), any warrants then "outstanding and unexpired" shall be adjusted such that the right to receive

shares, upon exercise of the warrant, shall be changed to a right to receive the same kind and amount of assets (whether they be stocks, other types of securities, etc.) that SSE shareholders received in connection with the Fundamental Equity change or reorganization event. (Warrant Agreement § 5.07(a); *see also* Opp'n at 10.)

However, in this case, there were no warrants that were "outstanding and unexpired," to which adjustments could and were required to have been made, following the effective time of the Merger. Pursuant to the Warrant Agreement, all Series A and C warrants expire on "the earlier of (i) Close of Business on August 1, 2021 and (ii) the date of completion of . . . a Change of Control [which includes a Non-Affiliate Combination]." (Warrant Agreement § 1.01.) Likewise, all Series B warrants expire on "the earlier of (i) Close of Business on August 1, 2023 and (ii) the date of completion of . . . a Change of Control." (*Id.*) Here, the Merger, which constituted a Non-Affiliate Combination for the reasons stated earlier, was completed on April 20, 2017. (PUTI Form 8-K.) As such, by the time the Merger became effective, shortly thereafter at the Effective Time, all warrants then outstanding had already expired.

Because the one provision in the Warrant Agreement that applies to Non-Affiliate Combinations, Section 5.06(d), expressly allows for the early termination of warrants, this Court dismisses Plaintiff's breach of contract claim for failure to adequately allege breach of the Warrant Agreement, on the basis of the Acceleration Clause.

## C.    Plaintiff Fails To Sufficiently Allege Tortious Interference With Contract

Plaintiff's tortious interference claim is also dismissed because a claim for tortious interference depends on a plausible allegation of either an underlying breach of contract, or interference with contract that "somehow renders performance [under the contract] impossible."

-15-

*Museum Boutique Int'l, Ltd. v. Picasso*, 886 F. Supp. 1155, 1162–63 (S.D.N.Y. 1995). Here, Plaintiff fails to sufficiently allege either.

## IV.   PLAINTIFF'S AMENDED COMPLAINT IS IMPROPER

Defendants' motion to strike is also granted because Plaintiff failed to seek leave to amend his Complaint. Plaintiff filed his Complaint on March 31, 2017. Defendants moved to dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) on April 28, 2017. The last day for Plaintiff to amend his Complaint as a matter of course was May 19, 2017—twenty-one days after April 28, 2017. *See* Fed. R. Civ. P. 15(a)(1). Yet, Plaintiff filed his Amended Complaint nearly four months later on April 28, 2017, without seeking leave to amend. Plaintiff's Amended Complaint, therefore, is improper.

Even if Plaintiff had sought leave to file his Amended Complaint, Plaintiff's motion would have been denied as futile. Most notably, aside from the conclusory allegations that Plaintiff is a Registered Holder, Plaintiff's Amended Complaint does nothing to remedy Plaintiff's lack of standing. (*See* AC ¶¶ 12, 14). In an obscure line of reasoning, Plaintiff attempts to argue in the Amended Complaint that he and *all* warrant holders are in fact Registered Holders because all of them "acquired their warrants as a result of [an] 'exchange' of their old pre-bankruptcy SSE common shares or their purchase of warrants on the open market through their brokers, which transactions were all recorded." (*Id.* ¶ 14.) While the Warrant Agreement contains provisions related to the registration of certain transactions involving the transfer or exchange of warrants, (*see* Warrant Agreement § 3,) a Registered Holder is defined by the identity of "the [p]erson in whose name any [w]arrant is registered upon the Warrant Register," not by the type of transactions in which any warrants are involved. (Warrant Agreement § 2.03(a).) As such, Plaintiff's Amended Complaint must be rejected, regardless of whether Plaintiff properly moved to amend his

Complaint. *See, e.g.*, *Ortiz v. Westchester Med. Ctr. Health Care Corp.*, No. 15 CIV. 5432 (NSR), 2016 WL 6901314, at *4 (S.D.N.Y. Nov. 18, 2016) (citation and quotation marks omitted) (denying plaintiff's leave to amend because the amended complaint failed to remedy plaintiff's lack of standing and would, in turn, be futile).

## V.    CONCLUSION

Defendants' motions to dismiss the Complaint and to strike Plaintiff's Amended Complaint are GRANTED.

The Clerk of Court is directed to close the motions at ECF Nos. 10 and 28, and this case.

Dated: February ___, 2018
New York, New York
.FEB 0 6 2018

SO ORDERED.

George B. Daniels
GEORGE B. DANIELS
United States District Judge

-17-